**THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| Cassidy J. Green, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 18 C 8269 |
| v. | ) | |
| | ) | Hon. Jeffrey I. Cummings |
| Josh Boedigheimer, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Cassidy J. Green brought this suit pursuant to 42 U.S.C. §1983, alleging that his Fourth Amendment rights were violated on January 15, 2018, when defendant Josh Boedigheimer used covert surveillance inside his residence during a criminal investigation without prior judicial approval. Boedigheimer moved for summary judgment, (Dckt. #175), arguing that Boedigheimer is entitled to qualified immunity; the authorization of covert video surveillance did not violate plaintiff's rights; and the doctrine of *res judicata* forecloses plaintiff's Fourth Amendment claims. Because the record establishes that Boedigheimer's authorization of the covert video surveillance did not violate plaintiff's constitutional rights, Boedigheimer is entitled to qualified immunity and Boedigheimer's motion for summary judgment is granted.

I.     **BACKGROUND**

**A. Northern District of Illinois Local Rule 56.1**

Local Rule 56.1 governs the procedures for filing and responding to motions for summary judgment in this Court. The rule is intended "to aid the district court, 'which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information,' in determining whether a trial is necessary."

*Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011) (internal citation omitted.)  Local Rule

56.1(a) requires the moving party to provide a statement of material facts that complies with Local

Rule 56.1(d).  LR 56.1(a)(2).  Local Rule 56.1(d) requires that "[e]ach asserted fact must be

supported by citation to the specific evidentiary material, including the specific page number, that

supports it.  The court may disregard any asserted fact that is not supported with such a citation."

LR 56.1(d)(2).

The opposing party must then respond to the movant's proposed statements of fact.  *Schrott*

*v. Bristol-Myers Squibb Co.*, 403 F.3d 940, 944 (7th Cir. 2005);  LR 56.1(e).  In the event of any

disagreement, "a party must cite specific evidentiary material that controverts the fact and must

concisely explain how the cited material controverts the asserted fact.  Asserted facts may be

deemed admitted if not controverted with specific citations to evidentiary material."  LR

56.1(e)(3).  "[M]ere disagreement with the movant's asserted facts is inadequate if made without

reference to specific supporting material." *Smith v. Lamz,* 321 F.3d 680, 683 (7th Cir. 2003).

Because plaintiff is proceeding *pro se*, Boedigheimer served him with a "Notice to *Pro Se*

Litigant Opposing Motion for Summary Judgment" as required by Local Rule 56.2.  (Dckt. #183)

Despite his receipt of the Local Rule 56.2 Notice, plaintiff did not respond to Boedigheimer's L.R.

56.1 statement of facts, and the response he did file is not supported by citations to the record aside

from his reference to paragraph 9 of a document entitled "Information Furnished to Defendant

Pursuant to Illinois Supreme Court Rule 412."  (Dckt. #184, ¶3.)  In consideration of his *pro se*

status, the Court will consider evidentiary assertions in plaintiff's response to the extent that they

are supported by the record and/or contain information about which plaintiff could properly testify.

*See Sistrunk v. Khan*, 931 F.Supp.2d 849, 854 (N.D.Ill. 2013).

The Court, however, will not look beyond any cited material.  *See Johnson v. Cambridge*

2

*Indus.*, *Inc.*, 325 F.3d 892, 898 (7th Cir. 2003) (district courts "are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them."). Where plaintiff has not properly responded to paragraphs of Boedigheimer's Local Rule 56(a)(1) statement of material facts, the Court will accept them as true to the extent supported by the record. *Lamz*, 321 F.3d at 683. Nonetheless, the Court is mindful that plaintiff's failure to strictly comply with Local Rule 56.1 does not automatically warrant judgment in favor of Boedigheimer because he has the ultimate burden of persuasion to show that he is entitled to judgment as a matter of law. *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006).

### B. Relevant Facts

Plaintiff filed his pro-se civil rights complaint pursuant to 42 U.S.C. §1983 and the Prisoner Litigation Reform Act, 28 U.S.C. §1915, on January 25, 2019. (Def's SOF, Dckt. #177, ¶3.) Plaintiff was then a pre-trial detainee incarcerated at the LaSalle County Detention Center pursuant to a Criminal Information filed in LaSalle County Circuit Court, Case No. 2018 CF 158 (the "State Case"), for unlawful delivery of a controlled substance, stemming from an investigation of an incident that occurred on January 15, 2018. (*Id*., at ¶4.)

Boedigheimer served as the commander of the Tri-County Drug Enforcement Narcotics Team (aka the Tri-Dent Task Force) from 2014 to 2022. (*Id.* at ¶5). The Tri-Dent Task Force is an Illinois multi-agency law enforcement organization which focuses on criminal drug investigations in and around LaSalle, Putnam, and Bureau Counties. (*Id*., at ¶11.) Boedigheimer was responsible for its overall management including supervising Task Force drug investigations, supervising the use of confidential informants by agents, and approving the use of covert video surveillance in drug investigations. (*Id*., at ¶10.)

Plaintiff alleged that on January 15, 2018, he was subject to overhear/eavesdropping

3

surveillance by Kye Denault ("Agent Denault") and a confidential informant, defendant Jonathan Helgren ("Helgren"), while he was inside his residence at 4462 East 1251st Road, Unit 31 in Earlville, Illinois (the "Earlville residence"). (*Id.*, at ¶5.) Plaintiff confirmed at his deposition that his claim against Boedigheimer is a Fourth Amendment claim brought because Boedigheimer approved video surveillance without prior judicial approval that was used in the investigation of plaintiff while plaintiff was at his Earlville residence on January 15, 2018. (*Id.*, at ¶¶6, 7.)

In October 2017, Boedigheimer became aware that Agent Denault had received approval from LaSalle County Assistant State's Attorney Brian Vescogni for the Task Force to use Helgren as a confidential informant. (*Id.*, at ¶12.) On or about January 14 or 15, 2018, Boedigheimer was advised by Agent Denault that Helgren had information pertaining to heroin drug sales being conducted by plaintiff in Earlville, Illinois. (*Id.*, at ¶13.) Boedigheimer was also advised by Agent Denault that Helgren was friends with plaintiff, had purchased heroin from him prior to January 15, 2018, including at plaintiff's Earlville residence, and agreed to cooperate with the Task Force to act as a confidential informant in their drug investigation of plaintiff. (*Id.*, at ¶14.)

Based on the information he received on January 14 or 15, 2018, Boedigheimer approved Agent Denault's request to place a covert camera on Helgren's body to capture recorded silent video surveillance during a planned drug buy between Helgren and plaintiff at plaintiff's Earlville residence on January 15, 2018. (*Id.*, at ¶16.) After Agent Denault placed the covert camera on Helgren's body, he drove Helgren to plaintiff's Earlville residence at approximately 11:16 a.m. while Helgren kept the covert video camera on and recording. (*Id.*, at ¶17.) Boedigheimer was not present with Denault and Helgren. (*Id.*) At the time of the drug buy between plaintiff and Helgren, plaintiff was living at the Earlville residence with his mother Michelle Nash ("Nash") and Nash's boyfriend Glenn Olsen ("Olsen"), and he had been living there for five years as of

January 2018. (*Id.*, at ¶22.) After a drug buy between Helgren and plaintiff was completed on January 15, 2018, Denault downloaded the silent video obtained by Helgren into the Tri-Dent Task Force computer system, at which time Boedigheimer reviewed the silent video. (*Id.*, at ¶18.)

The Tri-Dent video shows Helgren walking down a hallway before stopping at the first door on the left, which was plaintiff's bedroom door. (*Id.*, at ¶42.) After Helgren walks out of plaintiff's bedroom, Olsen and Nash are depicted in the living room area. (*Id.*, at ¶43.) Helgren then assisted Nash in cutting up heroin on the living room table. (*Id.*) Up to 11:28:29 on the Tri-Dent video, Helgren was talking with Olsen and Nash in the front room area while plaintiff (who was very familiar and comfortable with Helgren being inside the residence) remained in his bedroom. (*Id.*, at ¶44.) Helgren left the residence at the 11:28:33 mark on the video. (*Id.*) The video also shows that plaintiff had welcomed Helgren into the bedroom on January 15, 2018. (*Id.*, at ¶45.) Nash could not specifically recall Helgren's presence inside the residence on January 15, 2018, but testified that neither she nor Olsen told Helgren that he was not welcome in the residence at any point. (*Id.*, at ¶46.)

At his deposition in this matter, plaintiff identified Helgren's photo, who he also identified as "Chip", as someone he had known and had been friends with since seventh grade, through high school and up through the date of plaintiff's April 25, 2018, arrest. (*Id.*, at ¶25.) Prior to January 15, 2018, Helgren never told plaintiff that he was working with law enforcement. (*Id.*, at ¶26.)

Olsen likewise identified Helgren's photo, and testified at his deposition that he also knew him as "Chip." (*Id.*, at ¶27.) Olsen knew that plaintiff and Helgren had been friends since high school. (*Id.*, at ¶28.) Olsen also knew that Helgren had been to the Earlville residence from time to time and was welcome in the residence, and Olsen had no reason not to allow Helgren into the residence at any time. (*Id.*, at ¶29.) Plaintiff and Nash always allowed Helgren into the residence

5

when Helgren would come over.  (*Id*., at ¶30.)  Plaintiff never told Olsen at any time prior to January 15, 2018, that Helgren was not welcome in the residence.  (*Id*., at ¶31.)  Olsen only became aware that Helgren was the informant who assisted law enforcement in their January 15, 2018, investigation after plaintiff was arrested in April 2018 and went to court on the charges, as discussed below.  (*Id*., at ¶32.)

Nash also identified the photograph of Helgren and testified that she knew him as "Chip" or "John."  (*Id*., at ¶33.)  Nash knew that Helgren had gone to junior high school with plaintiff in Sandwich, Illinois, they had remained friends, Helgren was welcome at their residence, and she considered him a trusted family friend.  (*Id*., at ¶34.)  Nash did not know that Helgren was a "snitch" who was working with law enforcement on January 15, 2018.  (*Id*., at ¶35.)  Nash did not know that Helgren was a potential informant at any time before plaintiff was arrested in late April 2018.  (*Id*., at ¶36.)  Nash also first became aware that Helgren was the informant who helped law enforcement set up the January 15, 2018, drug buy with plaintiff at some point after plaintiff was arrested in April of 2018.  (*Id*., at ¶37.)

Rachel Burdette and plaintiff had been friends for a couple months as of January 15, 2018. (*Id*., at ¶47.)  Burdette identified Helgren from his photograph and testified that she also knew him as "Chip," and that he was part of the circle of friends who used to hang out with plaintiff during the 2017 to 2018 time period.  (*Id*., at ¶48.)  Burdette knew plaintiff sold heroin when they were friends in 2017 and 2018 and was present several times before January 15, 2018, when plaintiff sold drugs to Helgren and others at plaintiff's Earlville residence.  (*Id*., at ¶49.)  Burdette had never observed plaintiff tell Helgren he was not welcome inside plaintiff's Earlville residence prior to January 15, 2018.  (*Id*., at ¶50.)  Burdette was with plaintiff and Helgren in plaintiff's bedroom on January 15, 2018, when the video was created.  (*Id*., at ¶51.)  Burdette saw plaintiff get a drug

6

baggie with heroin ready for Helgren while Helgren held up money while standing next to plaintiff. (*Id*., at ¶53.)

Plaintiff did not become aware that Helgren had assisted law enforcement with the January 2018 investigation against him until the Fall of 2018 when Helgren's identity as an informant was disclosed during the criminal proceedings in the underlying State Case. (*Id*., at ¶56.) Plaintiff still considered Helgren to be a friend whom he trusted until he was advised in the Fall of 2018 that Helgren had assisted law enforcement. (*Id*., at ¶57.) Plaintiff believed that Helgren had his cell phone number as of January 15, 2018. (*Id*., at ¶58.) Plaintiff asserted his Fifth Amendment right against self-incrimination when asked at his deposition whether he had ever sold drugs to Helgren prior to January 15, 2018. (*Id*., at ¶59.) Plaintiff testified that he could not recall if Helgren was at the Earlville residence before January 15, 2018, but surmised that if he had been it was because Helgren was a casual friend. (*Id*., at ¶60.) Plaintiff agreed that the video at 11:22:30 to 11:22:58 shows Helgren enter the residence, walk down a hallway to the first door on the left, and then walk into plaintiff's bedroom. (*Id*., at ¶61.)

Plaintiff was not in the living room area when Helgren first walked into the residence and thus did not know what, if anything, was said by either Helgren or plaintiff's mother (Nash) when Helgren arrived or whether Nash had welcomed him into the residence. (*Id*., at ¶62.) Plaintiff agreed that the video (at 11:23:00 to 11:23:11) depicts him walking up to Helgren after Helgren entered plaintiff's bedroom and giving him a handshake, as well as a "fist bump" greeting. (*Id*., at ¶63.) Plaintiff never escorted Helgren out of the residence or called the police on Helgren while Helgren was at the Earlville residence on January 15, 2018. (*Id*., at ¶64.) Plaintiff could not recall anything that was said between he and Helgren after Helgren entered Plaintiff's bedroom that day. (*Id*.) When shown the Helgren video at 11:23:30 to 11:23:58, plaintiff asserted his Fifth

Amendment rights when asked whether the video showed him holding what counsel described as a baggie or some type of cellophane packet. (*Id*., at ¶65.)

Plaintiff was arrested on April 25, 2018, at his Earlville residence as a result of the January 15, 2018, Tri-Dent investigation. (*Id*., at ¶66.) Plaintiff filed fifteen motions between June 2018 and April 2019, raising various issues pertaining to the creation of the Tri-Dent video during the pendency of the State Case. (*Id*., at ¶67.) Plaintiff raised constitutional challenges under both the United States and Illinois Constitutions in several of his motions. (*Id*.) On July 16, 2019, LaSalle County Circuit Court Judge Michael Jansz held a hearing to address the various state and federal constitutional arguments plaintiff raised with respect to the Tri-Dent video in the fifteen motions identified as Group Ex. I. (*Id*., at ¶68.) After hearing argument from plaintiff and the State, Judge Jansz denied plaintiff's motions to suppress the Tri-Dent video. (*Id*., at ¶69.)

On August 30, 2019, plaintiff pled guilty in the State Case to a Class 1 felony for unlawful delivery of a controlled substance. (*Id*., at ¶70.) On September 11, 2019, plaintiff filed a motion to withdraw his guilty plea. (*Id*., at ¶71.) Plaintiff stated that he was seeking relief, in part, based on his assertions that Judge Jansz erred in denying his motions to suppress the video pursuant to a "Constitutional violation" and that the police did not receive judicial approval or authorization to execute an overhear. (*Id*.) On March 22, 2021, Judge Jansz denied plaintiff's motion to withdraw his guilty plea after finding that a majority of plaintiff's other claims raised in his motion, including his claim that the Tri-Dent video should be suppressed, had already been ruled upon and rejected. (*Id*., at ¶72.) Judge Jansz reiterated that his prior rulings remained in effect. (*Id*.)[1]

On March 31, 2021, plaintiff appealed the denial of his motion to withdraw his guilty plea to the Third District Illinois Appellate Court under Appeal No. 3-21-0135. (*Id*., at ¶73.) In Parts

---

[1] The Court's ruling on the motion to withdraw guilty plea is documented on pgs. 30-37 of the March 22, 2021 transcript.

VI through X of his Notice of Appeal, plaintiff wrote that he was also appealing the circuit court's

ruling denying his motions to suppress the contents of the Tri-Dent video under both the Fourth

Amendment and Illinois law. (*Id*., at ¶74.) The State Appellate Defender's Office was appointed

to represent plaintiff; however, on December 28, 2021, the Appellate Defender moved to

withdraw, in accordance with *Anders v. California*, 386 U.S. 738 (1967), stating that after

examining the record, counsel was unable to find any arguable errors warranting the appeal. (*Id*.,

at ¶75.) On May 3, 2022, the Third District Appellate Court affirmed the judgment of conviction

and granted the Appellate Defender's motion to withdraw, stating that "upon review of the record,

we agree with the conclusion of the State Appellate Defender's motion and brief that there are no

arguable errors to be considered on appeal and that to continue with this appeal would be wholly

frivolous." (*Id*., at ¶76.) On September 28, 2022, the Illinois Supreme Court denied plaintiff's

Petition for Leave to Appeal. (*Id*., at ¶77.)

## II.     SUMMARY JUDGMENT STANDARD

On summary judgment, the court must view the record in the light most favorable to the

non-moving party and grant the motion if the record shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law. *Gupta v. Melloh*, 19

F.4th 990, 997 (7th Cir. 2021). Summary judgment is warranted "against a party who fails to make

a showing sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317,

322 (1986).

The party seeking summary judgment bears the initial burden of showing the grounds for

their motion. *Id.* at 323. Once that party does so, "the burden shifts to the non-moving party to

provide evidence of specific facts creating a genuine dispute." *Carroll v. Lynch*, 698 F.3d 561,

564 (7th Cir. 2012). Mere "metaphysical doubt" is not enough; rather, a factual dispute is genuine

only when a reasonable jury could return a verdict in favor of the non-moving party. *Id., quoting*

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). The court must

construe all facts in the light most favorable to the nonmoving party and draw all legitimate

inferences in favor of that party. *Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d

508, 512 (7th Cir. 2008). "A court's role is not to evaluate the weight of the evidence, to judge

the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether

there is a genuine issue of triable fact." *Id.*

### III. ANALYSIS

Boedigheimer moved for summary judgment, making three arguments: (1) Boedigheimer

is entitled to qualified immunity; (2) the authorization of covert video surveillance did not violate

plaintiff's rights; and (3) and that the doctrine of *res judicata* forecloses plaintiff's Fourth

Amendment claims. The undisputed facts in the record indicate that Boedigheimer is entitled to

summary judgment.

### A. *Boedigheimer is Entitled to Qualified Immunity*

Boedigheimer asserts that he is entitled to qualified immunity for his authorization of video

surveillance on January 15, 2018. The doctrine of qualified immunity protects government

officials from liability for civil damages in situations in which their conduct does not violate a

clearly established statutory or constitutional right. *Gupta*, 19 F.4th at 1000 (citing *Pearson v.*

*Callahan*, 555 U.S. 223, 231 (2009)); *see also Plumhoff v. Rickard*, 572 U.S. 765, 778 (2014).

"There are two inquiries in determining whether qualified immunity applies: [1] whether the facts,

taken in the light most favorable to the party asserting the injury show that the officer's conduct

violated a constitutional right; and [2] whether the right at issue was 'clearly established' at the

time of the officer's alleged misconduct." *Tousis v. Billiot*, 84 F.4th 692, 698 (7th Cir. 2023) (cleaned up). Although this is ordinarily a two-step process, where the undisputed facts taken in the light most favorable to the plaintiff fail to establish a cognizable violation of constitutional rights, defendant is entitled to qualified immunity. *See, e..g.*, *Lanigan v. Village of East Hazel Crest*, 110 F.3d 467, 472 (7th Cir. 1997).

Therefore, the Court begins with an analysis of whether there is any merit to plaintiff's underlying constitutional claim. Once more, plaintiff asserts that his Fourth Amendment rights were violated when Boedigheimer used covert surveillance inside his residence during a criminal investigation without a warrant.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A search occurs either when the government physically intrudes without consent upon "'a constitutionally protected area in order to obtain information,'" *United States v. Jones*, 565 U.S. 400, 407 (2012) (quoting *United States v. Knotts*, 460 U.S. 276, 286 (Brennan, J., concurring), or "when an expectation of privacy that society is prepared to consider reasonable is infringed," *United States v. Karo*, 468 U.S. 705, 712 (1984) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)).

The undisputed factual record shows the following. Helgren, the confidential informant, had known plaintiff for many years and had been in plaintiff's residence on prior occasions. Helgren entered plaintiff's residence on January 15, 2018, with the consent of all persons present, including plaintiff, his mother, Nash, and her companion, Olsen. None of them objected to Helgren's presence either before or during the drug transaction on January 15, 2018. The video footage submitted as Exhibit E and all of the deposition testimonies of plaintiff, Nash, and Olsen

11

confirm their consent to Helgren's presence in the residence.

Where, as here, "the informant discovers information from where he is lawfully entitled to be, the use of a recording device to accurately capture the events does not vitiate the consent or otherwise constitute an unlawful search." *U.S. v. Thompson*, 811 F.3d. 944, 949 (7th Cir. 2016); *see also U.S. v. Brathwaitz*, 458 F.3d 376, 380 n. 4 (5th Cir. 2006) (holding defendant forfeited his right to privacy in activities that were exposed to the confidential informant when he invited the confidential informant into his home, citing cases from the Second, Third, Sixth, Eighth, Ninth, and Eleventh Circuit holding the same). This situation mirrors that in *Thompson*, where the defendant moved to suppress, arguing that he had a reasonable expectation of privacy in the information captured by the recordings. The Seventh Circuit rejected this argument as "frivolous," noting that a person does not "have a privacy interest in what he voluntarily discloses to an informant" and that surreptitious audio or video recordings taken by an informant do not transform the informant's actions into a search. *Thompson*, 811 F.3d at 949-50; *Brathwaitz*, 458 F.3d at 380 n. 4 (citing cases).

Furthermore, by inviting Helgren into his residence, plaintiff gave up any reasonable expectation of privacy that he might have entertained prior to consenting to Helgren's presence. Like the informant in *Thompson*, Helgren, the confidential informant who bought heroin from plaintiff, could be called on to testify about what he saw and heard during his transactions with plaintiff. The video recordings of Helgren's transactions with plaintiff do not constitute a search because Helgren did not intrude, he was there at the invitation of plaintiff and others, and, as in *Thompson*, any notion that plaintiff had an expectation of privacy under the circumstances is frivolous. Accordingly, the Court finds that Boedigheimer's approval of the video surveillance did not require a warrant as there was no physical intrusion or expectation of privacy. Thus, for

12

purposes of the Fourth Amendment, there was no "search," and therefore, for purposes of qualified immunity, there was no violation of plaintiff's constitutional rights.

Because the Court finds that plaintiff has not met his burden of establishing that Boedigheimer violated any of plaintiff's clearly established rights when he authorized Helgren to conduct covert video surveillance, Boedigheimer is entitled to qualified immunity. Finally, because the Court finds that Boedigheimer is entitled to qualified immunity, the Court finds it unnecessary to address Boedigheimer's remaining arguments and his motion for summary judgment is granted.

## CONCLUSION

For the reasons stated above, defendant Boedigheimer's motion for summary judgment [175] is granted.

**DATE: September 17, 2024**

_____
**Jeffrey I. Cummings**
**United States District Judge**

13